## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WANDA J. HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | 13-cv-4443 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Wanda J. Harris ("Harris") worked as a school psychologist for Defendant the Board of Education of the City of Chicago ("the Board"). Harris brings claims against the Board for age and race discrimination, constructive discharge, harassment, and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, Title VII of the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1981 and 1983. The Board has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. It contends that Harris's harassment claim falls outside the scope of her December 27, 2012, Equal Employment Opportunity Commission ("EEOC") charge; any claims based on events occurring before March 2, 2012, are time-barred; and the harassment, constructive discharge, and retaliation claims based on race and age discrimination fail on the merits. For the reasons provided herein, the Court grants the Board's motion and enters judgment in its favor.

# I. Factual Background[1]

Harris worked for the Board as a school psychologist in the Chicago Public School system. She is African-American. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 3. Harris was approximately 54 and 55 years old during the period of time between 2010 and 2012, when the alleged discrimination took place. *See id.* On March 27, 2012, Harris submitted an "Application for Resignation–Person Enhancement Program (PEP)" to the Board, listing the effective date of her resignation as June 30, 2012. *See id.* ¶ 4. The Board accepted Harris's retirement via letter the same day. *See id.* Her last day of employment with the Board was June 18, 2012, the last day of that school year. *See id.*

Throughout the relevant period, the Board maintained a Comprehensive Non-Discrimination, Title IX and Sexual Harassment Policy ("Non-Discrimination Policy") which prohibited unlawful harassment, retaliation, and discrimination based on employees protected status, including age and race. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 9; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 9.

Over the course of her employment, Harris filed three internal union grievances, an "unfair labor practices" charge with the Illinois Educational Labor Relations Board ("IELRB"), and a discrimination charge against Dr. Hireshemo B.

---

[1] The following facts are undisputed unless otherwise noted. The Board argues that Harris has frequently failed to comply with Local Rule 56.1 in her response to the summary judgment motion. *See* Def.'s Reply 3. While the Court declines to strike Harris's Local Rule 56.1 statement in its entirety, where she fails to comply with the Local Rule, the Court will decline to consider the deficient statement of fact or denial, as appropriate. *Ammons v. Aramark Uniform Servs.*, 368 F.3d 809, 817 (7th Cir. 2004) (parties must strictly comply with Local Rule 56.1).

Clark ("Dr. Clark) with the Board's "Equal Opportunity and Compliance Office" ("EOCO").   In these documents, she claimed that she was overscheduled, overworked, denied union representation, unfairly disciplined, and suffered other contractual issues.  *See id.* ¶ 21.  The Board contends that Harris never raised any allegations of discrimination, harassment, or retaliation based on race or age in the filings.  Harris disputes this.  *See id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 21.

## A.     The Principal Actors

During the period in question, Dr. Hireshemo B. Clark ("Dr. Clark") was the sole Psychology Manager for the Board and Harris's immediate supervisor.  As such, he controlled Harris's work schedule, assignments, and discipline.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 5.

Jeffrey Dase ("Principal Dase") was the principal at Coles Elementary School ("Coles"), where Harris worked as a school psychologist during the 2009–10 school year.   However, Principal Dase never served as Harris's supervisor and did not control her day-to-day work activities.  *See id.* ¶ 6.  Principal Dase also had no control over Harris's disciplinary actions.  *See id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6.

Dr. Sheldon House ("Principal House") was the principal of Simeon Career Academy High School ("Simeon"), where Harris worked as a school psychologist during the 2010–11 school year.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 7.  Principal House never disciplined Harris nor recommended that she be disciplined.  *See id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 7.  Dr. Clark, Principal Dase, and Principal House are all African-American. *See id.* ¶¶ 5–7.

Rosalba Najera-Porte ("Ms. Najera-Porte") was the Director of Clinical and Related Services for the Board. In this capacity, she was responsible for over 1,300 related service providers (including school psychologists such as Harris), and thirteen clinical managers (including Dr. Clark). *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 8.

## B.    Harris's Employment History

### 1.    2009–10 School Year[2]

During the 2009–10 school year, Coles' school counselor informed Principal Dase that Harris was not getting her work done. Specifically, the counselor noted that Harris was not completing her psychological reports to include in Individualized Educational Plans ("IEPs") for certain students as required by law. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 10. Principal Dase then met with Harris and contacted Lisa Ingram, the network supervisor for clinicians who are responsible for contributing to IEPs, about the issue.[3]

Harris, however, contends that the deficiencies in her reporting were due to the fact that she had received conflicting guidelines on how to properly finalize reports in the IMPACT system. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 10–12. Harris further alleges that the failure to provide training, along with Principal Dase's

---

[2]    Before the alleged discrimination began in 2010, Harris's evaluations described her as a "superior employee." *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 75. But Harris had received four separate notifications of "Failure to Transmit Service Documentation" from James Livingston, the Senior Advisor for Psychological Services, in 2000 and 2002. *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 75.

[3]    After Harris left Cole, Dr. Clark also learned that Harris had left certain psychological reports in the Board's Instructional Management Program and Academic Communications Tool ("IMPACT") system unfinished, in draft-form, and unfinalized. *See id.* ¶¶ 11–12.

decision to contact Ingram, was the result of both age and race discrimination. *See id.* ¶¶ 11–12. This began a series of complaints by Harris that she was not being provided sufficient training on the new computer system; she began asking for training during a "number of meetings" in 2010, 2011, and 2012. *See id.* ¶ 52.

In response to Harris's requests, Ms. Najera-Porte told Harris that "it was not the Board's responsibility to train [her]," and "[she] should know how to do [her] jobs." *See id.* The Board, however, trained all of its school psychologists on the use of IMPACT, and anyone who desired additional training received it—no one was ever refused training. *See id.* ¶ 53. School psychologists also were trained on how to complete and finalize their reports and evaluations in IMPACT. *See id.*

Be that as it may, Harris does not dispute that she was trained in the use of IMPACT and the process for finalizing psychological reports. It is also undisputed that she had properly finalized reports in IMPACT in the past. *See id.* ¶ 54. Dr. Clark also advised Harris to sign up for additional training if she needed it. *See id.* Harris, however, contends that she continued to receive conflicting guidance regarding the finalization process. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 53–54.

Scheduling and school assignments also became an issue for Harris during the time she worked at the Board. From August of 2010 to September of 2011, the Board had a policy of seniority rights. Harris claims, however, that she "had to sit there and watch while the newer employees were given a choice of the schools that were left while [she] could have been, as a senior psychologist, given those choices[.]" *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 49. When she complained to Dr. Clark,

he told Harris that "[i]f [she] continue[d] to ask about [her] schedule, [he was] going to send [her] all the way over to O'Hare and [she would] never be able to cover [her] schools." *See id.* Harris, however, did not otherwise observe younger psychologists receive different treatment, and no one at the Board made specific comments to Harris about her age. *See id.* ¶ 50.

### 2. 2010–11 School Year

On August 29, 2010, just prior to the start of the 2010-11 school year, Harris told Dr. Clark that she believed her "overscheduling" was due to her age because newer psychologists received better treatment, but that she was not certain whether race was also a factor. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 22. Harris believes the overscheduling was in response to past grievances she filed about scheduling. *See id.* It is undisputed that school psychologists' schedules are created electronically using an objective formula that determines how much of the Board's approximately 220 school psychologists' time will be allocated to each school based on collected data. *See id.* ¶ 23. Harris asserts, however, that although employee preferences do not supersede scheduling decisions made by the Board, the Board, and sometimes the employees, do influence school scheduling. *See id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 23.

Over the course of the 2010–11 school year, Principal House contacted Dr. Clark on three or four occasions concerning problems with Harris. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 15. Principal House was informed that Harris lied about interviewing a particular student's parents when she had not done so. *See id.* ¶¶

13–15.  He also received complaints that Harris's office space was unclean and cluttered, which he verified.  *See id.*  At Principal House's request, Harris was not reassigned to Simeon the following year.  *See id.* ¶ 15.  For her part, Harris denies that she had intentionally misrepresented that the parental meeting had occurred. She also states that her office space was never unkempt and alleges that it was Principal House who threw her office belongings into the hallway.  *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 13–15.

In addition, over the course of the 2010–11 school year, Dr. Clark himself observed and received complaints from co-workers, principals, case managers, and compliance analysts at other schools about Harris's inadequate and incomplete psychological reports, her failure to complete other mandatory tasks, and the messy state of her workspace.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 16–18. Harris does not dispute that Dr. Clark investigated the allegations by speaking to her about the problem and meeting with her case managers.  *See id.* ¶ 18.

On October 15, 2010, Dr. Clark met with Harris concerning her failure to finalize her psychological reports during her time at Coles, at which point Harris asserted and was denied her *Weingarten* rights.[4]  *See id.* ¶ 24.  Harris also stated that she should be allowed to pick certain schools for her schedule before new hirees picked their schools.  *See id.*  Harris alleges this was age discrimination—because

---

[4]     *Weingarten* rights are a worker's right to have a union representative during an interview that she reasonably believes may lead to disciplinary action.  *See N.L.R.B. v. Weingarten, Inc.*, 420 U.S. 521 (1975).

she had a seniority clause in her contract—and race discrimination. *See id.* After this meeting, Dr. Clark changed Harris's schedule. *See id.* ¶ 25.

On October 20, 2010, Dr. Clark issued to Harris a Cautionary Notice based upon her failure to finalize draft psychological reports.[5] Although the Board contends that these notices did not impact Harris's employment, Harris disagrees and states that the notices and reprimands affected her position and conditions of employment by making her fear for her pension, job, and reputation. *See id.* ¶ 20; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 20.

Harris continued to attempt to address her failure to finalize her reports. On November 1, 2010, Harris met with Dr. Clark to show him documents that she felt demonstrated the real reason for the unfinalized reports at Coles. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 26. At this meeting, Dr. Clark showed Harris emails he had received from Principal Dase saying that Harris was a liar, and that Dr. Clark should not believe her. *See id.*

At this time Harris further complained about racist comments allegedly made by Principal Dase in September and October of 2010.[6] *See id.* ¶ 58. According

---

[5]     Dr. Clark also issued a Written Reprimand on February 18, 2011, for another similar but separate infraction. Additionally, Harris received a Warning Resolution from the Board on June 22, 2011. *See id.* ¶ 19.

[6]     The Board objects to Harris's LR 56.1(b)(3)(C) Stmt. ¶ 76 because "Plaintiffs Exhibits 6, 7, and 8 refer to communications about Principal Dase made to a third party by another employee, not by or to Plaintiff, and as such, are inadmissible hearsay." *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 76. Hearsay is an out of court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial[.]" *Eisenstadt v. Cent. Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The Court finds Exhibits 6, 7, and Exhibit 8 to be inadmissible double hearsay. They do not fit the 801(d)(2)(A) exception of statements because these exhibits refer to complaints and emails written by or collected

8

to Harris, Principal Dase had made discriminatory comments on three occasions over these months: during a staff meeting where he referred to Harris's work group as "this [B]lack team[;]" when he showed statistics that north-side schools were doing much better than south-side schools where the majority of Black teachers worked; and when he said that White teachers' lesson plans were written much better than Black teachers'. *See id.* ¶ 28; Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 76. None of these statements, however, were directed specifically at Harris. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 28. Further, Principal Dase avers, and Harris disputes,[7] that these comments were made on October 15, 2009, a full year before Dr. Clark disciplined Harris for not finalizing her reports. *See id.* And, while race was brought up often at Board meetings, it was not used in a negative or discriminatory fashion.[8] *See id.* 58. In any event, despite evidence of Principal

---

by Christopher Prenger (not a party to the litigation) about Principal Dase, and not Principal Dase himself.

In addition, Harris's LR 56.1(b)(3)(C) Stmt. ¶ 77 is stricken from the record. First, Harris's assertions about the Whiteface incident are unsupported by the documented evidence of record offered in support of the statement. *See* Def.'s Ex. C, p. 30–32; *see also Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012). Second, Exhibit 8, in so far as it is used to support the Whiteface incident, is inadmissible hearsay because Harris was not present for the incident, and thus has no personal knowledge of Principal Dase's alleged response. *See* Fed. R. Evid. 801, 802. Christopher Prenger's out of court statement cannot serve as evidence that Principal Dase signified that "while blackface is racist, there is nothing wrong with whiteface." *See id.* Harris cannot, therefore, rely on it. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.").

[7] Harris testifies, however, that these comments were made in September or October of 2010. *See* Def.'s Ex. A, p. 50–53.

[8] The Board also objects to Harris's LR 56.1(b)(3)(C) Stmt. ¶ 82 because "Plaintiff's Exhibits 8, 9, and 10 involve complaints made by another employee, not Plaintiff, and do not relate to Plaintiff in any way." *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 82.

Dase's racist comments, Dr. Clark still disciplined Harris and believed Principal Dase's email saying Harris was a liar. *See id.* ¶¶ 26–27.

In addition to receiving the notices and reprimands, Harris continued to complain about scheduling: that she was "scheduled severely" and "forced to work extreme hours." *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 79; Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 79. However, according to the Board, Harris received "a standard, full-week, '1.0' schedule, where each day out of a five work-day week at a particular school counted as '.2.' . . . [And] was not assigned to more than one school in the same day." *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 80. The Board does not dispute that Harris discussed her schedule Dr. Clark, but disputes that the changes "only further exacerbated" her workload. *See id.* ¶ 79; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 79.

On December 29, 2010, Harris received an email from Dr. Clark stating that a lawyer for the Board was requesting that she finalize a psychological report. Harris believes this was a violation of her rights because it was sent during Christmas vacation when other employees were not required to work. *See* Pl.'s LR

---

Exhibits 9 and 10 include EOCO investigative final reports involving Christopher Prenger's complaints about Principal Dase's behavior. The decision to admit into evidence results of an agency's determination of an employment discrimination claim is discretionary. *See McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 929–30 (7th Cir. 1984). Courts, however, should be reluctant to admit documents made in anticipation of litigation as they "lack sufficient guarantees of trustworthiness to be excepted from the hearsay rule." *See Moffett v. McCauley*, 724 F.2d 581, 584 n.1 (7th Cir. 1984) (citing *Palmer v. Hoffman*, 318 U.S. 109, 111 (1943)) (considering former Rule 803(24)); *see also United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993) ("[W]e adhere to the well-established rule that documents made in anticipation of litigation are inadmissible under the business records exceptions [to the general hearsay prohibition].").

56.1(b)(3)(C) Stmt. ¶ 29. Harris, however, states that she never opened the email in question over Christmas vacation. *See id.*

In January and February of 2011, Harris met with Dr. Clark a number of times after she had filed a grievance about the denial of her *Weingarten* rights. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 47. During this time, Dr. Clark stated that Harris would be disciplined for not finalizing her reports, and that he would discipline her "to the hilt" for filing the grievance against him. *See id.*

### 3. 2011-12 School Year

Prior to the start of the 2011–12 school year, Harris believes she was discriminated against because Dr. Clark changed her schedule for the worse after she had told him that she had been assigned to a high school that was "overloaded and had an extreme amount of students" three days a week, in addition to two elementary schools. *See id.* ¶ 30.

Also prior to the start of the school year, Dr. Clark had advised Harris and other clinicians not to leave test kits in schools over the summer. *See id.* ¶ 32. Harris, however, did not heed this advice, and found that materials that she had left at Simeon had been removed from her office; Harris believes most that her test kits had been stolen. *See id.* ¶ 31. Harris opines this also was due to discrimination, *see id.*, and believes that Dr. Clark did not conduct a true investigation into the missing materials. *See id.* ¶ 32; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32.

Thereafter, Dr. Clark instructed one of the lead psychologists, Brian Apollo, to replace Harris's standard battery of testing kits, and he also instructed Harris to contact Mr. Apollo to receive these kits. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 33. Harris ended up borrowing—she asserts by force—test kits from other psychologists, buying six other kits with her own funds, and obtaining the rest of the standard office supplies from the school. *See id.* ¶ 34; Pl.'s LR 56.1(b)(3)(C) ¶ 34. Harris did not request repayment for the test kits she purchased. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 34. Nevertheless, Harris asserts that the Board "fail[ed] to provide [her] with test kits and materials" to do her job. *See* Pl.'s LR 56.1(b)(3)(C) ¶ 80; Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 80.

On November 29, 2011, Harris attempted to email the Board's CEO and Inspector General asking about the policy on finalization of psychological reports, but she was told she did not have the right to email them. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 36. Harris believes this was due to race discrimination because white employees could email the CEO and Inspector General and receive responses. *See id.* However, Harris provides no evidence of other white employees who could email the CEO and Inspector General. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36.

The next month, on December 1, 2011, when Harris requested representation at an upcoming meeting she had scheduled with Ms. Najera-Porte about the complaint she had made to the Illinois State Board of Education, she was told she did not need it. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 37. Harris believes this was discriminatory because she should not be called in by her boss for filing a complaint.

*See id.* Harris then asserted her *Weingarten* rights prior to the meeting with Ms. Najera-Porte. *See id.* ¶ 38.

On December 15, 2011, at the meeting, Ms. Najera-Porte told Harris that she should "stop writing to people" and "stop complaining . . . or else," but she did not elaborate. *See id.* ¶ 39. Harris also asserts Ms. Najera-Porte denied her the *Weingarten* rights she had asserted. *See id.* During the meeting, Ms. Najera-Porte blamed Harris for losing her materials and leaving them in the middle of the floor. *See id.* ¶ 40. However, it is undisputed that no disciplinary action occurred because of this meeting. *See id.* ¶ 39.

The next year, on January 5, 2012, Harris faced possible discipline for "going to jury duty" and coming "in late to school the next day" when she was supposed to be at a charter school. *See id.* ¶ 41. As a result of Harris's absence from a federally required meeting that day, a student was not tested, and the Board fell out of compliance with federal requirements. *See id.* ¶ 42. Harris believes she informed the charter school that she would be absent as a result of jury duty. *See id.* ¶ 42; Pl.'s LR 56.1(b)(3)(C) ¶ 42. Harris was permitted to take paid time off that day for jury duty service and was never suspended for "going to jury duty." *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 43. Harris, however, contends that she was disciplined and reprimanded for this absence by both Dr. Clark and Ms. Najera-Porte. *See id.* ¶ 43, Pl.'s LR 56.1(b)(3)(C) ¶ 43.

Events that concerned Harris continued to occur. During a meeting on Feburary 23, 2012, Dr. Clark called on employees that happened to be white and

talked to them about problems they had with the computer, but he stated that they would not be disciplined. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 44.

Soon before Harris's last day of employment, Harris again complained that someone "had unfinalized [her] documents." *See id.* ¶ 48. June 18, 2012, was Harris's last day of employment with the Board, and the last day of that school year. *See id.* ¶ 45.

On June 22, 2012, four days after her last day with the Board, Harris wrote an email asserting that "75%" of her files had been "unfinalized." *See* Pl.'s LR 56.1(b)(3)(C) ¶ 83; Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) ¶ 83. Harris does not know when the purported "unfinalization" occurred, "couldn't say" if any particular person made any changes to her document, and has no specific knowledge if anyone made any changes to those documents. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 48. Dr. Clark testified that he investigated Harris's allegation by examining "event logs" in the IMPACT system, which showed that Harris's "reports were posted in draft [form] and that they were never finalized . . . ." *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) ¶ 83.

In an email dated June 25, 2012 to other Board administrators discussing Harris's complaint about the "unfinalization" of her documents, Dr. Clark wrote: "More antics from Wanda Harris." *See id.* ¶ 83; Pl.'s LR 56.1(b)(3)(C) ¶ 83. Furthermore, Ms. Najera-Porte testified that she "did not follow up on [Harris's] claims, that she did not recall what follow-up was done in response to [Harris's] accusations, and that she did not know if anything was done after [Harris] made the accusations." *See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) ¶ 83.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir.2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

## III. Scope of the Charge

The Board first argues that Harris's harassment claim cannot be brought here because it was not reasonably related to Harris's EEOC charge. *See* Def.'s Mot. Summ. J. 3–4. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)) (internal quotations omitted). "Nevertheless, because most EEOC

charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500. As a result, "all Title VII claims set forth in a complaint are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc); *see also Shamim v. Siemens Indus., Inc.*, 854 F. Supp. 2d 496, 504 (N.D. Ill. 2012) (stating that the standard is a liberal one). Claims are reasonably related "if there is a factual relationship between them." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001).

Harris's EEOC charge alleges she was constructively discharged after complaining about discipline, and that she was discriminated against because of her race, age, and in retaliation for engaging in protected activity. *See* Def.'s Mot. Summ. J., Ex. N. June 1, 2012 is the only specific date mentioned in the EEOC charge. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 46.

Harris's "complaint must [, at a minimum,] describe the same conduct and implicate the same individuals as allegations in the EEOC charge." *Geist v. Glenkirk*, No. 01-C-0700, 2001 WL 1268574, at *4–5 (N.D. Ill. Oct. 23, 2001) (quoting *Cheek*, 31 F.3d at 501). Here, Harris's Amended Complaint meets this standard. Harris's harassment claim implicates Dr. Clark and Principal Dase, and concerns Principal Dase's racist comments, the scheduling issues, and the denial of grievances.

For its part, the Board argues that Harris's EEOC charge does not mention "harassment" directly. This argument falls short. Claims different in kind may be linked "where they are so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act." *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) (internal quotations omitted). Indeed, the cases cited by the Board recognize this. *See Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992) (noting the broad and remedial purpose of Title VII should be kept in mind when construing a charge); *see also Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992) (noting the standard is a "liberal one").

Harris's EEOC charge could have been more detailed. But the actors and actions underlying her harassment claim are reasonably related to her EEOC charge. The Court finds Harris's harassment claim falls within the scope of her charge.

### IV. Timeliness of Harris's Claims

The Board also argues that Harris's claims are untimely. *See* Def.'s Mot. Summ. J. 4–5. Harris filed her EEOC charge on December 27, 2012. Thus, any claims based on events occurring before March 2, 2012 (300 days previous to the charge), are untimely. Although Harris does not delineate neatly between discrete claims of discrimination and hostile work environment claims, the Court must assess each type of claim separately. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

## A. Race and Age Discrimination Claims

Harris alleges fourteen discrete dates in her Amended Complaint where she believes the Board discriminated against her due to her age and race, ranging from August 29, 2010 to June 18, 2012. *See* Am. Compl. 2, 7. *Morgan* requires that a plaintiff file a charge with the EEOC for each separate discrete act of discrimination within the required period of time. 536 U.S. at 113 (stating that each discriminatory act "starts a new clock for filing charges alleging that act"). Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. *Id.* at 105. For purposes of this statute of limitations, discrete discriminatory employment actions, such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts. *See id.* at 109–111.

All but one of the dates identified by Harris occurred before the March 2, 2012 statute of limitations cut-off. The only timely discrete incident identified in Harris's complaint is Harris's last day of school—June 18, 2012. Harris, however, concedes there were no discriminatory acts on June 18, 2012. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 45. While "it is well settled that evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer[,]" *Mathewson v. Nat'l Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986), Harris does not allege any timely *discriminatory*

acts that fall within the 300-day limitations period. Harris therefore cannot maintain her race and age discrimination claims, and summary judgment must be granted on these claims.

## B.     Retaliation

Harris identifies five incidents of alleged protected activity and resulting retaliation. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 68–72. The first four incidents underlying Harris's retaliation claim fall outside of the March 2, 2012, statute of limitations. Harris cannot, therefore, base her retaliation claim on these incidents. However, the fifth incident, which occurred on March 20, 2012 when Harris brought a discrimination charge against Dr. Clark with the EOCO, is timely. *See id.* ¶ 71. Consequently, Harris can base her claim for retaliation on it, and the March 20, 2012 event will be discussed below as part of the Court's merits analysis.

## C.     Harassment Claims

Harris identifies multiple incidents of harassment by the Board that she claims created a hostile work environment. All but one of these incidents fall outside the statutory period. The timely event occurred in May or June of 2012, when Harris argues someone "unfinalized" her psychological reports. This is a timely act of harassment sufficient to invoke the continuing violation doctrine. *See* Pl.'s Mem. Opp'n 5–6.

Claims of hostile work environment are different in kind from discrimination because they involve repeated conduct that does not fully manifest itself on any particular day. Therefore, a hostile work environment claim is timely so long as one

of the acts contributing to the hostile work environment occurred within the 300-day filing period. *Morgan*, 536 U.S. at 116–117. The continuing violations doctrine, therefore, links a time-barred act with an act that occurred within the 300-day limitations period by treating the separate claims as one continuous act. *See Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The May or June 2012 "unfinalization" incident to which Harris attests makes her harassment claim timely.[9]

### D.    Constructive Discharge

Harris contends that she was constructively discharged on June 18, 2012. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 4. The Board dates Harris's resignation letter to March 27, 2012. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 4. Regardless of the date of her constructive discharge, both dates fall within the statutory time limit. Therefore, like her harassment claim, Harris's claim for constructive discharge is timely.

## V. Merits

The Court turns to the timely claims for retaliation, harassment, and constructive discharge. Defendant argues that these claims all fail on the merits. The Court addresses each claim below.

---

[9]    Defendant does not directly address the June 2012 "unfinalization" incident in their Reply. Defendant argues more generally that "[a]cts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that she had a claim," *Garrison v. Burke*, 165 F.3d 565, 569 (7th Cir. 1999). But Defendant does not articulate any argument applying this standard to the June 2012 "unfinalization" incident. Even if Defendant had, the continued applicability of this standard in the Seventh Circuit as it applies to Title VII harassment claims has been called into doubt because of the Supreme Court's holding in *Morgan*. *See Everson v. City of Madison*, 672 F. Supp. 2d 881, 885 (W.D. Wis. 2009) (noting "the version of the continuing violation doctrine espoused in *Garrison* is no longer good law . . . . In fact, the [Supreme] Court explicitly overruled *Galloway v. General Motors Parts Operations,* 78 F.3d 1164 (7th Cir.1996), the case *Garrison* cites for its standard") (citing *Morgan*, 536 U.S. at 116–17 n.11, 117–18).

## A. Retaliation

"In addition to forbidding discrimination directly, Title VII also forbids employers from retaliating against employees by taking adverse employment actions for complaining about prohibited discrimination." *Chaib v. Indiana*, 744 F.3d 974, 986 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 159 (2014) (internal quotations omitted). "Retaliation may be established by either the direct or the indirect method of proof." *Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 754 (7th Cir. 2014).

The direct method "requires the plaintiff to show: (1) that he engaged in activity protected by the statute; (2) that his employer took an adverse employment action against him; and (3) that there is a causal connection between the plaintiff's protected activity and the adverse employment action." *Id.* The direct method also has a "circumstantial" route, that is, "[p]ieces of circumstantial evidence . . . may be combined to support an inference of discriminatory intent." *Carter v. Chic. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015); *see Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 803 (7th Cir. 2014).

By contrast, the indirect method requires a plaintiff to "show that he: (1) engaged in statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity." *Moultrie,* 766 F.3d at 755. "If [a plaintiff] can establish a prima facie case, the burden then shifts to [defendant] to produce a non-discriminatory reason

for its employment action." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 983 (7th Cir. 2014). "If [defendant] meets its burden of production, then [the] plaintiff[ ] must demonstrate that [defendant's] proffered reason is pretextual." *Id.*

As noted above, Harris's retaliation claim must be based on the March 20, 2012, discrimination charge she filed with the EOCO against Dr. Clark. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 71. But Harris concedes that she suffered no adverse employment action as a result of her filing the EOCO charge. *See* Pl.'s LR 56.1(a)(3) Stmt. ¶ 71.. Because Harris must provide facts to show adverse employment action under either the direct and indirect test, summary judgment is granted in favor of the Board on Harris's retaliation claim.

## B. Harassment

Harris's harassment claims also fail on the merits. An employer violates Title VII and the ADEA if it is responsible for a "hostile work environment." *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (Title VII); *Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 603 n.1 (7th Cir. 2014) (assuming without deciding that hostile work environment claim is permitted under the ADEA). A plaintiff must create a genuine issue of material fact as to all of the following elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) her . . . race [or age] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *See Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011) (race); *Fugate*, 555 F. App'x at 603 n.1 (age). Courts look to the

conduct's "frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance" to determine whether it is severe or pervasive. *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012).

### 1. Harassment Based on Age

With regard to the harassment claim based on age, Harris has failed to create a genuine issue of material fact regarding severe or pervasive conduct. Harris's only evidence for age harassment is that psychologists she believed were younger were "given consideration within their schedules for choosing schools." *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 64. Harris states that she "[did not] exactly [know] their ages[,]" but they "looked very young and were new." *See* Def.'s Mot. Summ. J., Ex. A at 35. Harris also believes she was not trained properly on IMPACT. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 53. But it is undisputed that no one at the Board made any specific comments to Harris about her age. *See id.* ¶ 51.

Even viewing these facts and circumstances in Harris's favor, no reasonable jury could find the conduct sufficiently severe or pervasive to have altered the terms or conditions of Harris's employment. *See Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (even offensive conduct that causes an employee "significant discomfort and distress" is not generally sufficient to demonstrate a hostile environment if the conduct is infrequent or of limited duration). First, no comments were directed to Harris directly about her age. Second, other than her own speculation about her colleagues who "looked young," she has presented no

similarly situated individuals who were offered preferential treatment because they were younger. [10] *Cf. Bio v. Fed. Express Corp.,* 424 F.3d 593, 597 (7th Cir. 2005) (affirming summary judgment where plaintiff identified a white comparator with the same title, but did not present evidence that they were comparable in experience); *Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 615 (7th Cir. 2001) (affirming summary judgment where plaintiff offered only her conclusory assertions that "male officer" was treated more favorably). Furthermore, Harris has not presented evidence demonstrating that the issues that she had experienced with her schedule were physically humiliating or threatening, unreasonably interfered with her work, or occurred with great frequency. Summary judgment is granted in the Board's favor on Harris's claim for age-based harassment.

### 2. Harassment Based on Race

Harris's harassment claim based on her race fares only slightly better. Specifically, Harris alleges that the Board denied her grievances and asked for her IELRB charge to be stayed. Harris also point to Principal Dase's racist comments in September and October 2010: during a staff meeting where he referred to Harris's work group as "this [B]lack team[;]" when he presented statistics showing that North-side schools were performing better than South-side schools; and when he said that White teachers' lesson plans were better written than those of Black

---

[10]     Harris does point to Carol Hayes and claims that, at least according to Hayes, she had received her "dream schedule." But Harris does not provide any additional detail about Hayes and her circumstances.

teachers.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 28; Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 76.[11]

Even viewing the facts in Harris's favor, as the Court must, no reasonable jury could find this evidence sufficiently severe or pervasive to have altered the terms or conditions of Harris's employment.  On summary judgment, Harris must provide evidence that her work environment was "objectively hostile" within the meaning of Title VII.  *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007).  Harris offers no such evidence.

First, Harris offers no evidence or argument connecting the denial of her grievances and staying of her IELRB charge with her race.  *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) ("While it is true that harassment need not be *explicitly* racial in order to be probative of a hostile work environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.") (emphasis in original) (internal citations omitted).  The harassment of which Harris complains "could just as readily been perpetrated upon a white person without any alteration in its character or purpose." *Beamon*, 411 F.3d at 864.  There is no inherently racial component to an employer denying grievances or staying charges, and Harris identifies no further evidence of

---

[11]     Harris also points to an incident where Principal Dase allegedly condone an African-American employee who came to work dressed in "white-face." *See* Pl.'s Mem. Opp'n 6.  But as Defendant points out, Harris did not identify this event in discovery, and was unaware of it prior to summary judgment.  And Harris cannot defeat summary judgment by relying on an event of which she was unaware. *See Mason v. SIU at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000).  In any event, the record does not support Harris's contention that Principal Dase had condoned this behavior.

a connection between the denial of her grievance, the staying of her IELRB charges, and her race. *See id.* (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) ("[A]lleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.").

Second, regarding Principal Dase's racist comments from September and October 2010, "the mere utterance of an . . . epithet which engenders offensive feelings in an employee" is not sufficient to establish a hostile work environment. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Further, "[t]he infrequency of the offensive comments is relevant to an assessment of their impact . . . . A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). Here, Principal Dase's comments were isolated incidents. And the comments were made well before Harris decided to retire. This is not sufficient to establish a genuine dispute of an objectively hostile work environment.

Furthermore, the alleged harassment about which Harris complains was not directed at her. *See* Def.s' Ex. A, p. 49–53. While relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the "impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) (quoting *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993)) (rejecting sexual harassment claim, in part,

because neither of the two verbal communications cited by the plaintiff as evidence of a "hostile work environment" were "directed at her personally.").

Harris, in short, offers no admissible evidence from which a reasonable fact-finder could infer an objectively hostile work environment. Summary judgment is granted in the Board's favor on Harris's claim for race-based harassment.

### C.    Constructive Discharge

Harris's constructive discharge claim fares no better.    A constructive discharge occurs where an employer "makes an employee's working conditions so intolerable that the [reasonable] employee is forced into an involuntary resignation." *Saxton*, 10 F.3d at 536–7 (quoting *Weilhaupt v. Am. Med. Ass'n*, 874 F.2d 419, 426 (7th Cir. 1989)).    "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).    But Harris has not succeeded on the merits of her harassment claims, which dooms her constructive discharge claim.    *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) ("Because [Plaintiff] failed to establish a hostile work environment, his claim for constructive discharge also must fail."). Summary judgment is granted in favor of the Board on Harris's constructive discharge claim.

### D.    § 1981 and § 1983 Claims

Lastly, the Board argues that summary judgment should be granted as to Harris's § 1981 and § 1983 claims because there is no evidence that the Board had a custom, policy, or practice that promoted race or age discrimination, no evidence of widespread discrimination against African-Americans or persons over 40 years of age, and no evidence that a final policymaker took such actions. *See McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). For her part, Harris concedes there was no official policy at work but argues one can be inferred from the Board's pervasive actions. *See* Pl.'s Mem. Opp'n 19–20.

While the Seventh Circuit has allowed policies to be inferred from "repeated actions directed at one person[,]" "[t]he plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *See Phelan v. Cook Cnty.*, 463 F.3d 773, 789–90 (7th Cir. 2006) ("It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once."). Here, Harris has not presented any evidence allowing the inference of a widespread practice of discrimination. The record does not support Harris's claims that she was "ignored," "given improper information regarding her finalizing documents," or that "Dr. Clark failed to investigate her claims of harassment." *See* Pl.'s Mem. Opp'n 19. Furthermore, Harris points to no evidence sufficient to show a pervasive pattern of discrimination that would constitute a cognizable policy; as such, Harris cannot

meet the high bar for establishing the existence of a widespread policy set in the Seventh Circuit. *See Phelan*, 463 F.3d at 790 (noting that "the word 'widespread' must be taken seriously" and a plaintiff must take individual incidents and "weave these separate incidents together into a cognizable policy"). Therefore, the Court grants the Board's motion for summary judgment as to Harris's § 1981 and § 1983 claims.

## VI. Conclusion

For the reasons set forth above, the Board's Motion for Summary Judgment [45] is granted. Judgment is entered in the Board's favor as to all claims. Civil case terminated.

**SO ORDERED**                    **ENTER: 9/28/15**

_____
**JOHN Z. LEE**
**United States District Judge**